110-3429, Heatmasters v. Jerome Caster Ladies and gentlemen, please report to counsel. I'm Larry Cassano, I represent Heatmasters in this case. Mr. Crosby, I reserve five minutes for rebuttals. This case involves a now 64-year-old HVAC worker who fell from a ladder during the course of his employment, injuring his right shoulder and arm, right ankle, and right foot. The claimant was accepted, compensation was paid, disability benefits were paid, medical expenses paid, vocational rehabilitation expenses incurred and paid. The case proceeded to trial, after which our attorney police chief awarded the petitioner a permanent total of disability benefits at $927 a week. As in our briefs, it manifests that the evidence in this case supports a different finding in terms of the issue of permanency. The claimant is incurably entitled to some permanent disability. In this case, he suffered injuries, and those injuries were not in his case. It's our position, as set forth in the briefs, that a permanent total disability award was not appropriate and not supported by the evidence and against the manifest weight of the evidence in the case. And we rely heavily on the following evidence. First and foremost, the petitioner retired, and he made a conscious, knowing, and voluntary decision not to work. He told his vocational expert, with whom he met one time in August 2008, that he had retired and did not want to work. Based on that clear, knowing, and voluntary statement of the petitioner, it can't be denied that he voluntarily removed himself from the workforce such that a permanent total disability is simply not appropriate in this case. On our review, at the industrial commission level, Commissioner Nancy Lindsay recognized that very well in her dissent. She held, or stated in her dissent, that the petitioner was not permanently disabled. As he had no intention of returning to work, he didn't look for work following his surgery, and he voluntarily chose not to work. The manifest weight of the evidence supports Commissioner Lindsay's finding, and not the contrary one of the majority. The evidence in this case shows her on that the petitioner was noncompliant with his chosen physician, Dr. Holmes. There are multiple references in the record that he, for example, was weight-bearing when he was told by his doctor time and time again, don't be weight-bearing, don't bear weight. The evidence is clear and not contested, and he was bearing weight, and he did bear weight, even though the respondent provided crutches and a rollabout and devices to avoid weight-bearing. Counsel? Yes. What about the issue or the argument that it's unrealistic to attempt vocational and job placement services when the claimant is undergoing treatment and contemplating a further surgical procedure? What about that argument? Well, at the time both services were begun, he was released to sedentary work. Further treatment was later determined to be necessary. The surgery was prescribed. The second surgery was prescribed. At that time, both efforts were suspended. And the plan was, let's resume them after he has the surgery and finishes his treatment. However, the order was already over the dam at that point. The petitioner then made it very clear he had no intention of going back to work, and he wasn't going to comply with or cooperate with our vocations. Remember, Judge, there's the interview we set up at Garrett's appointment, a job within his restrictions. He went to it, and he told Peter, he shows up to the interview, and he tells them it couldn't work, which was not true at the time, that the job would be boring, and that he was making $70,000 anyway and getting paid anyway. This presentation, based on the evidence, Judge, is that you expect from somebody who clearly does not want to work. What did Dr. Belmonte have to say? I don't think he's a doctor. Joe Belmonte? Yeah, the voc expert. He met with the guy one time. He didn't do a labor market survey. And he says, I don't think there's anything this guy can do. He says, and I've never heard this before, only 10% of the jobs out there in the state are cemeteries. So 9% of the jobs out there, he doesn't qualify for anyway, because only he can do a cemetery. However, his testimony ostensibly supports the claimant's position, does it not? I can't argue with that. And you believe that Riscatti's opinions are obviously much more well-reasoned, obviously, than Belmonte, but isn't it really up for the commission to determine? Again, I can't disagree with you that there is evidence. There is some evidence. Is that all that's needed to sustain the commission's finding, that there's some evidence in the record to support the commission's finding? No, but that's not my understanding. My understanding is that the manifest way, the great way to begin, is most of the way to begin. Why don't we stick with manifest? Great and overwhelming, you're getting a little bit carried on here with your standard. My understanding is that it's the manifest way to begin. I think that's correct. And if there's a small bit of evidence that supports a contrary finding, but the manifest way to begin... I think it actually is the opposite conclusion clearly apparent. It's more than the small. Okay. I know you're sort of liberalizing, and I understand, you know, Ryder's choice here, and you're making the argument, but I just wanted you to clarify that. I think, yeah, I think, I'm not disagreeing with you. I think that's the law. But it's my position that the manifest way of the evidence is contrary to the bit of evidence that we're seeing. And that is why? Because we should believe the claimants, or believe the respondent's experts over the claimants? Is that why we come to that conclusion? Well, maybe he doesn't. But if there's objective evidence to support that, does that take it out of the realm of compensability? To support what? There's objective evidence to support that there is no stable market, continuous employment for him, as Belmonte says. It's my position that the great way of the evidence is that it contradicts Belmonte's. We're back to the great way? Yeah. Okay. But, I mean, I don't know how you give Belmonte's report anyway. Where he meets with a guy one time and doesn't do a labor market survey, doesn't contact any employers, or prospective employers. He didn't do anything except read some records and write a report that he suspected his guy wanted. On the other hand, we've got EJR's records where they actually work with this man to try to find a job for him. Place him in a job that he could do. It's undisputed that he can do secretary work. I mean, everybody agrees that there's work this guy could do physically. And then the question is, well, is there a job out there for him? Is there a reasonably stable market for him, given his restrictions and his education? My position is, the EJR records identify multiple employers, prospective employers. And they identify and arrange interviews, which the guy in Burkina was sad about, because he didn't want to go back to work. Given that, I don't know how you conclude that this man should be awarded this winning call. He's getting his union pension. How, in this evidence, do you give the guy, in addition to that, a lifetime check of $927 a week, when he sabotages a job interview and tells his own book expert, I don't want to work anymore? That's not a permit total case, in my view, at all. The proven outlaw permit total, he's got to prove he's not performing any services, except those with which there's no reasonably stable market. Are you depending on Wes Cotty's report? Reports. I'm not counting down. I'm not pointing to Wes Cotty's reports. And what did the commission think about his report, and so far, information about his age, training, education? The commission concluded, made its decision based on Belmonti, not on the statute. Was something wrong with that? Based on the statute, yes. I think it's totally, I mean, that's why we're here. That's why we're here. I think that finding is the problem. The Belmonti report, in any way, any way an objective, reasonable person looks at that report in light of all the other evidence in this case, cannot conclude that that's sufficient to satisfy petitioner's burden of proof in this case that he's a permit total, that he's an outlaw. It isn't there. This is not an outlaw case. Is it an AD2 loss of trade? Maybe. Is it an AD foot and arm case? Maybe. It's not a permit total based on this evidence. All the doctors agree, as I said, that he's at least capable of sedentary work. And where a guy determines that he doesn't want to go down that road and look for and search out sedentary work, when that happens, I don't think he gets rewarded for that. I don't think it does. In my view of the world, he doesn't get, shouldn't get rewarded for that kind of behavior. So that decision, when he made that choice, that's his decision. Given the facts, and in particular, his retirement statement, this guy, Belmonti, who we weren't working for, it's our position that the decision of the majority should be reversed. Commissioner Lindsey had it right. And we ask the court to reverse the decision for a man in determination of whether or not he's entitled to it. Whether it be AD2, a man who's an old lady. Any questions? Thank you. As the panel is well aware, for a permit total, an outlaw, it's difficult for a person to do sedentary work. It certainly does not disqualify that person from getting a permit total for it. Here we have someone, the time of our creation was 61 years old. And he was a younger man, but I have a different story. His active age was 38 years. He was a skilled tradesperson. Again, he had helped multiple jobs over his lifetime. And he was not skilled in a single trade, but I have a different story. His education, he's got a high school diploma. Again, if he weren't highly educated, it might be a different story. His disability, it's sedentary. But he basically shattered his ankle. He was a big man. He was 280 pounds. He falls 10 foot off a ladder. It's a suspended ceiling. I think it was at the Walgreens store in Michigan. And he falls to the ground and shatters his ankle. He has two surgeries that end up with a non-union in the ankle. It's a very disabling injury. If there's somebody to be indicted in this case, it's not the public health. We choose the horrible job placement services provided by the respondent. There was no vocational assessment done by the respondent in this case. There was no vocational retraining. There was no attempt to tell my client how they were going to do on a job. This guy's been in the union for 38 years. He's probably never been given a job in his life. So at this point, there's a lousy job. There's one job in there. And that's supposed to disqualify him in terms of- What is your response to counsel's argument, sort of paraphrasing it, that Dr. Belmonte's opinion is patently inferior to- or Mr. Belmonte's opinion is patently inferior to Mr. Viscotti's opinion? I don't think it is. I mean, you take the factors that, of course, helps age, occupation, education, and disability. Those speak volumes to the conclusion you're going to come to in this case. You don't need a labor market study for a 21-year-old guy who's got 38 years to get a highly tailored skill position with a minimal education and a horrible disability. On the other hand, what the respondent has is- they don't really have a final conclusion. They voluntarily put a job placement on hold a year and a half before the trial in this case. And the only job placement they did is five months. I mean, I've tried more than a few of these, and I've had more than a few clients who have gone through a job placement, usually a year plus, as you see. Here, they voluntarily quit job placement after five months because the status of having more surgeries. There was nothing in their vocational reports that indicates it would be hopeless to continue a job placement. And there was no attempt to rehabilitate this petitioner so that he might be more employable and so that he might get a job placement. Yes, he took retirement from the union. There's no question about that. Everybody agrees that his career in the HBAC union is over with. That was perfectly appropriate. I mean, as much as I enjoy getting a lawyer to hear me from this panel, I don't want to work here, but I have to. All right, now remember, this is being recorded, Mr. Milken. I'm going to ask a question, and then I'm going to take this off. I'll be like Bill Rourke. I'll be about 90 years old. I'll still be here. But those things go into the calculation of a firm COBO. If this guy was a minimum-wage worker and had 20 different jobs in his career, that's a different story. Here's a guy who was making over $1,000 a week doing a skilled job. You can't really expect him to become a breeder at Walmart. That's not realistic. And that was blazingly obvious to Joe Bellati and at least two out of the three commissioners in the panel. So, you know, maybe somebody else would have decided this case differently, but certainly it's not even a close call. That's what I'm standing for. Any other questions? Thank you, counsel. Rebuttal? Thank you, counsel. Just a couple of questions. I can't imagine how somebody has to be trained or told that they don't go into a job interview and say, I don't really want this job, or I don't know why I'm here, or I'm getting paid for doing nothing anyway, so why would I accept this job? That person doesn't. Nobody has to be trained not to say they have a job interview. This guy did everything he could to show that prospective employer he didn't want that job. This is what he did. No mystery there. He didn't want the job. He didn't want to work, just like Mr. Milton and maybe others of us who work so hard. He didn't want to work anymore. He would rather sit home and get paid for not working. That's the decision he made, and I don't think the decision of the commission should be affirmed here. All right. Thank you. Thank you, counsel. The court will take the matter under advisement for disposition.